Filed 2/11/16  In re Esther M. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re ESTHER M., a Person Coming Under the Juvenile Court Law. | B261106 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK 99250) |
| Plaintiff and Respondent, | |
| v. | |
| CHRISTIAN G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Anthony Trendacosta, Referee.  Reversed and remanded with directions.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, and Jessica Paulson-Duffy, Deputy County Counsel, for Plaintiff and Respondent.

M. Elizabeth Handy, under appointment by the Court of Appeal, for minor Esther M.

_____

Christian G. challenges orders of the juvenile court terminating his parental rights to Esther M., and denying his Welfare and Institutions Code section 388 petition for a change of court orders.[1] Christian contends the juvenile court committed numerous prejudicial errors, including by denying him presumed father status, and in failing to appoint counsel to represent him. DCFS concedes these errors; Esther does not. We reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2013, Theresa J. (mother) moved from Jacksonville, Florida to Los Angeles with her three children, Z.J. (15 years old), Esther M. (4 years old), and Amanda M. (almost 3 years old). Mother had breast cancer. In April 2013, mother felt ill and went to the hospital. Mother's childcare provider continued taking care of Esther and Amanda during the day; Z.J. took care of her two younger sisters after school. Tragically, on April 16, 2013, mother died while in the hospital. Members of mother's church, the married couple N.O. and P.O., took the children in. N.O. had first met mother on Easter Sunday.

The three children each had different fathers. N.O. told a social worker from the Los Angeles County Department of Children and Family Services (DCFS) that Esther's father lived in Florida. According to N.O., the children's maternal uncle had contacted the fathers to let them know of mother's death. On April 30, the social worker spoke with Christian on the telephone.[2] He gave the social worker his date of birth, address in Jacksonville, and telephone number. Christian told the social worker he wanted to come to California to retrieve Esther and take her back to Florida with him. Although he was not Z.J.'s or Amanda's father, he indicated he was willing to obtain custody of all three girls so they would not be separated. Christian also informed the social worker he took a paternity test in Florida because of a prior child support case with mother. The paternity

---

[1]    All further statutory citations are to the Welfare and Institutions Code unless otherwise noted.

[2]    The detention report does not indicate how this contact came about.

2

test determined he was Esther's father. He did not have Esther's birth certificate or social security card because mother had those documents. He reported mother did not have his permission to leave Florida with Esther, and he was very concerned about Esther's well being and safety.

The social worker informed Christian a dependency petition would be filed, a court hearing would be held on May 6, 2013, and at the hearing a judge would determine whether to release the children to him. During the April 30 conversation, Christian said he would attend the hearing. On May 2, the "IDC" social worker called Christian and asked him to come to California "immediately," so DCFS could assess him and avoid filing a petition regarding Esther. The detention report recounted Christian's response:

"The father reported that he got all his documents today that show the child being his daughter. The father also reported that he wants custody of the other two children, [Z.J. and Amanda], because he doesn't want the girls to split up. The father reported that he already has set his schedule to come to California on Saturday, 05/04/2013 night or Sunday, 05/05/2013 morning. The father reported that he has things to take care of and cannot come immediately. The father reported that he will be at the Court hearing on Monday, 05/06/2013 for sure. The father reported that it's raining really hard in Florida and he will not be able to get a flight over. The father reported that he did not want to put his life at risk. After further discussion, the father at one point stated that he can come to California at the earliest on Friday, 05/03/2013 afternoon, but would not commit to that. The father was provided with CSW and SCSW's number to contact them regarding assessing him."

On May 3, the IDC social worker called Christian again and asked him to fax his paternity documents to DCFS. He faxed a December 2011 original genetic test report indicating that as to Esther there was a [99.99 percent] probability of paternity. The report concluded Christian could not be excluded as Esther's biological father, and reported a combined paternity index of 763,103 to 1. Although not mentioned in the text of the detention report or an addendum report, attached to the detention report was a final judgment of paternity and report of a support enforcement hearing officer in Duvall County, Florida. The judgment, dated March 5, 2012, found Christian to be Esther's father and ordered him to pay current and retroactive child support.

3

On the evening of May 5, 2013, Christian left a message for the case social worker indicating that "due to funds not being available," he would not be able to attend the May 6 hearing. He said that when "funds became available," he would fly to California to get Esther and her siblings. On May 7, the social worker attempted to contact Christian to give him notice of the May 9 hearing.[3] Christian's telephone was disconnected. The detention report indicated the social worker sent Christian a letter by first-class and certified mail, informing him of the hearing. No proof of mailing or copy of any such letter was included in the record.

The social worker had also been in touch with a maternal uncle. She told the uncle that Christian intended to be present at the May 6 hearing and would request custody of the children. The maternal uncle said Christian had threatened and harassed him, including threats that Christian's "crew" would "handle" the uncle. The uncle did not want the children placed with Christian because, he said, Christian was unstable and dangerous. The uncle also reported Christian had other children and did not take care of them. In late April 2013, the uncle sent a notarized letter to DCFS indicating mother's family had decided they wanted N.O. and P.O. to have custody of the children.

Z.J., Esther's older sister, told the social worker she did not want to live with Christian because he had a lot of children he did not support financially. She also did not want Esther to live with Christian. Z.J. had known Christian since she was a small child; he used to come to the family's house to visit Esther, but Esther did not have overnight visits with him. Z.J. did not think Christian worked because he used to ask mother for money. She also reported Christian had a "bad background" and had been incarcerated "on a couple of occasions."

DCFS recommended that Christian be allowed a monitored visit with Esther if he appeared at the May 9 hearing.

---

[3]     It appears that the detention hearing for Z.J. and Amanda was held on May 6, while the detention hearing for Esther took place on May 9.

4

The dependency petition filed on May 9, 2013, alleged Esther came within the jurisdiction of the dependency court under section 300, subdivisions (b) and (g), based on the following allegation: "The child, [Esther M.], has no parent to provide care, supervision, and the necessities of life, including food, shelter, clothing and medical care for the child in that the child's mother, [Theresa M.], is deceased and the child's father, [Christian G.'s] whereabouts [are] unknown. Such lack of a parent endangers the child's physical health and safety and places the child at risk of physical harm and damage."

The minute order for the May 9 detention hearing indicates the juvenile court found notice of the proceedings had been given to "all appropriate parties as required by law." The court found Christian to be an alleged father, "pending further information." Esther was detained. The court ordered "monitored visits for father after contact with DCFS to be monitored by DCFS approved monitor."

In a June 2013 jurisdiction and disposition report, DCFS reported the children were still living with N.O and P.O. The social worker attempted to interview Christian by telephone on June 10 or June 11.[4] She encountered only a recording indicating the subscriber was unavailable. She was not able to leave a message. The report described Christian as a "non custodial father who is not requesting custody of the child." It further recommended that no family reunification services be offered to Christian. Based apparently on only the contacts with Christian prior to the detention hearing, and the one attempted telephone contact, DCFS concluded:

"The Department has informed and has had some contact with the father. The Department has given the father the opportunity to make an effort to retrieve his child but the father has failed to take the necessary steps in order to get custody of his child. As of the writing of this report the father has failed to keep in contact with the Department as his current whereabouts are unknown. The father by all accounts is the non-custodial parent and is not requesting Family Reunification Services nor is he requesting custody of his child. Therefore the Department is recommending that No Family Reunification Services be offered to [father]."

---

[4] The report described the attempted contact as taking place on different days on different pages of the report.

The report was dated June 11, 2013; father's last telephone message for DCFS was left on May 5, 2013.

On June 13, 2013, DCFS mailed notice of the June 26 jurisdiction and disposition hearing to Christian, by certified mail, to the address Christian had provided.[5] The proof of service indicated the social worker served a copy of the petition and the notice of the June 26 hearing.

On June 26, 2013, the court found notice had not been given to all appropriate parties as required by law. The hearing was continued to August 16.[6]

The June 13 notice of the jurisdiction and disposition hearing was returned to DCFS with a July 15, 2013 sticker indicating the letter was unclaimed and could not be forwarded.

On July 23, 2013, DCFS submitted a last minute information attaching a notice of a July 31 hearing and a JV-505 statement regarding parentage mailed to Christian by certified mail on July 2 or 3.[7] Copied on, or attached to the notice was the social worker's business card and the note: "Please call me/ Thank you." The last minute information did not advise the court that the previous notice of hearing had been returned, unopened, as unclaimed. The July 2, 2013 notice of the jurisdiction and disposition hearing was returned to DCFS with a July 31 sticker indicating the letter was unclaimed and could not be forwarded.

---

**5** As DCFS concedes on appeal, although the proof of service was dated June 11, and it stated the report was mailed on June 11, the postmark from a subsequently filed certified mail receipt bore a date of June 13, as did the notice and envelope that were eventually returned as unclaimed.

**6** The record does not include a reporter's transcript for this hearing. It is unclear from the minute order what flaws in notice the court identified. The order indicates only that DCFS was to present evidence of its due diligence in locating Z.J.'s father, and to provide notice to Amanda's father at his place of incarceration.

**7** Although the certified mail receipt bore a date of July 2, the envelope which was eventually returned bore a postmark of July 3.

6

On July 31, 2013, counsel for the children and for DCFS appeared. None of the fathers appeared. The court received the DCFS report, which concerned its due diligence as to one of the other fathers.

On August 12, 2013, DCFS sent Christian notice of the August 16 hearing, by certified mail. The notice was sent to the same address used for previous mailings. At the August 16 hearing, the court found notice was proper. The court also described Christian's whereabouts as unknown, concluding it could only find him to be an alleged father. The court sustained the subdivision (b)(1) and (g)(1) counts in the petition, as pled. The court removed Esther from her parents and concluded no family reunification services were available to Christian as an alleged father. The court set a section 366.26 hearing for February 14, 2014, noting, "That's on the off chance that one of these whereabouts unknown parents comes forward . . . to establish parentage."

The February 2014 section 366.26 report was brief. It indicated DCFS had not been able to facilitate visitation, noting Christian resided out of state. The report stated he had not made "significant efforts" to gain custody of Esther and, as such, return to his care was not an appropriate permanent plan option. N.O. and P.O. wished to continue caring for the children. DCFS recommended adoption as the permanent plan. DCFS did not recommend terminating parental rights at that time because it had not yet procured the children's birth certificates or mother's death certificate. Further, the case had not been assigned to an adoptions social worker to complete an adoption home study. On November 27, 2013, DCFS mailed notice of the February 14, 2014 section 366.26 hearing, by certified mail. The letter was returned with a December 30, 2013 sticker indicating the letter was unclaimed and could not be forwarded.

At the February 14, 2014 hearing, the court noted DCFS had attempted to serve Christian but the letter was unclaimed. The court continued the hearing to June 13, 2014, and ordered DCFS to present evidence of due diligence in locating the fathers.

In a June 13, 2014 last minute information, DCFS reported that on March 19, 2014, it had requested a due diligence search be initiated for Christian. On March 20, 2014, Christian called a DCFS social worker requesting information about Esther. He

7

told the social worker that at the time the case was initiated, he was working on getting his other children out of the Florida child welfare system. He repeatedly asked if DCFS would be sending Esther to Florida. According to the report, Christian told the social worker he did not want her to think he had "been doing nothing for these past months." She asked if he had tried to contact the social worker about Esther; he responded that "he only got the 'run around,' " and had been conducting his own research to determine who he needed to contact to get custody of Esther. After confirming his address, he again asked if Esther would be sent to Florida. When informed that DCFS was not recommending that Esther be returned to his custody, he ended the call. According to the report, on March 19, notice of the section 366.26 hearing was sent to his address; the return receipt was signed by a person sharing his last name.

By the June 13, 2014 hearing, Christian had contacted the court directly. The court appointed counsel to represent him and ordered that DCFS send him the JV-505 statement regarding parentage form. The matter was continued to allow counsel to speak to him. The JV-505 form was sent to him that day, by first-class mail.

At the subsequent August 14, 2014 hearing, Christian's counsel informed the court he had spoken with Christian, but since that conversation he had not responded to counsel's e-mails. The court continued the matter to October 15, 2014 to allow DCFS additional time to prepare.

On September 2, 2014, Christian's counsel filed a petition requesting a change in court orders pursuant to section 388. Christian sought a modification of the order denying him reunification services and setting a section 366.26 hearing. In the petition, he indicated he was requesting placement of Esther with him and he had provided information indicating he is Esther's biological father. He requested that the court take the section 366.26 hearing off calendar and return Esther to his care, or order reunification services for him, unmonitored visits, and a study under the Interstate Compact for Placement of Children. He attached a birth certificate issued August 18, 2014, identifying him as Esther's father. He also included the previously submitted order for child support declaring him Esther's father and the genetic test report.

Counsel also submitted the completed JV-505 form indicating Christian believed he was Esther's father and requesting presumed parent status. Christian stated he had already established parentage by a court judgment of parentage; Esther lived with him from January 2007 to January 2012; he told his parents, his other children, and other relatives he was Esther's father; he was present when Esther was born; he kept Esther instead of placing her in daycare; and he took Esther to have her ears pierced when she was two months old. He also asserted he had provided Esther shelter, clothes, food, and toys. She had spent time with his family from her birth until mother relocated to California.

The court granted a hearing on the petition. In October 2014, DCFS reported Esther (now six years old) had spoken to Christian five or six times. When speaking on the phone, Christian identified himself as her father, and Esther addressed him as her father. She was confused, however, at the idea of moving away to live with him.[8] N.O. continued to want to adopt all three girls and was not opposed to Christian having visits or other communication with Esther.

When asked if he planned to visit Esther in California or attend court hearings, Christian responded he did not want to visit Esther. Instead he wanted to take Esther home with him to Florida, and that would be his only reason for traveling to California. He was upset at receiving a notice regarding the termination of his parental rights. He wished to reunify with Esther. He expressed concern that Esther seemed to not know him anymore, but believed that if she saw him she would immediately remember him. In response to the social worker's suggestion that a visit from him might help in this process, Christian was adamant that he did not wish to visit; he intended to come to California to get Esther and take her home.

---

[8] Z.J. did not want Esther to move away to live with Christian as she wanted all of the sisters to stay together. She remembered that Christian used to work in mother's beauty salon in Florida. Z.J. did not have bad memories of him, but did recall that he frequently borrowed money from mother.

Christian provided the social worker with information about his living arrangements, his occupation (barber and entrepreneur), and his three other children, only one of whom lived with him. The social worked asked him the amount of his monthly rent; he said he would fax the information but did not. The social worker also asked him to provide detailed information about his monthly income and expenses. He declined, explaining he felt his private financial information was irrelevant.[9] He asserted he was able to take care of his children. The social worker concluded: "DCFS is unable to assess [Christian's] financial ability to care for the child Esther."

At DCFS's request, Christian provided three letters of support. In one letter, a case manager for Christian's son since June 2013 attested to his exemplary parenting. The case manager got involved with the family following allegations that the child's mother had abused him. The son was eventually placed with Christian, who, according to the case manager, had provided a safe and stable family environment. The case manager described Christian as self-employed, a hard worker, and a father who had maintained a stable home for his family through hard work and the support of extended family members. Two other letters came from people who had known Christian for many years. They attested to his high moral character, his trustworthiness, and his devotion to his children.

At the October 15, 2014 hearing on the section 388 petition, Esther's counsel argued Christian had received proper notice, yet he had "sat on the sidelines," and had not cooperated with DCFS. Counsel argued it was not in Esther's best interests to take her away from the family she had developed with her siblings and caretakers. Christian's counsel argued Christian was nonoffending under the petition, he was seeking custody, and he simply did not have the means to travel to California. Counsel asserted there was no detriment to returning Esther to Christian. Counsel for DCFS contended Christian could not show a changed circumstance or that it would be in Esther's best interest to be

---

[9]    This information was reported in a section of the report titled "Income and Expenses."

10

placed with him. Counsel asserted he had received proper notice; he had known about the case for the two years it had been pending; and he had not visited Esther since the proceedings began.

The juvenile court took the matter under submission, but noted Christian's counsel had not argued he did not receive notice, was misled, or his due process rights were violated. At a December 3, 2014 hearing, the juvenile court denied the section 388 petition. The court indicated there was "no question that [Christian] got notice at the earliest opportunity in this matter, and I don't believe that his 388 raised any notice issue." The court further explained: "The first information that I can find where the Department first sent him something is . . . June of last year. It does not appear that he contacted the Department at all until June of this year, at which point I appointed counsel for him."

The court further discredited Christian's JV-505 form in part because he stated he lived with Esther beginning in January 2007, but she was not born until August 2008. The court further noted that while Christian had documentation identifying him as the biological father, that finding resulted from a support order, suggesting he was not providing support. The court suggested the inference that Christian was not providing support called into question the credibility of his statements in the JV-505 that he had provided support to Esther. The court further indicated that although there was a birth certificate for Esther with Christian's name on it, the court did not know if Florida had rules akin to those in California "with respect to whether or not the parent was present and signed the various documents or whether somebody put the name on the form." The court thus concluded Christian had not established he was Esther's presumed father.

The court further determined that even if Christian had established presumed parent status, he had not established a change in circumstances or that it would be in Esther's best interest to grant the section 388 petition. The court noted Christian had known about the case since at least June 2013, yet he had not come to California to visit Esther, and Esther's confusion about him undermined his representations about their

11

bond. The court thus ruled it would not be in Esther's best interest to separate her from the caretaker or her siblings by a long distance.

The court then found the children adoptable, that it would be detrimental to return them to their parents, and terminated parental rights. Christian timely appealed.

## DISCUSSION

On appeal, Christian asserts several errors require reversal; DCFS agrees.[10] Esther, however, asserts we should affirm the juvenile court orders. We agree reversal is required. We focus on two significant errors: the finding that Christian is not Esther's presumed father and the initial failure to appoint counsel to represent him, which denied him the opportunity to be meaningfully heard.

## I.  The Trial Court Erred in Denying Christian Presumed Father Status

In general, " '[w]e review a juvenile court's determination of presumed parentage status under the substantial evidence standard.' [Citation.]" *In re D.A.* (2012) 204 Cal.App.4th 811, 824.)  However, "[a] court has said that when the trier of fact has concluded that the party with the burden of proof did not carry the burden and that party appeals, 'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' [Citation.]  'Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence

---

**10**    DCFS concedes Christian was denied proper notice of the jurisdiction and disposition hearing, and that the juvenile court erred in failing to appoint counsel. DCFS concedes these errors require reversal. DCFS further concedes the juvenile court erred in denying Christian presumed father status at the outset of the proceedings. It concedes the juvenile court erred in denying Christian reunification services, and that the court failed to assess placement with him under the appropriate legal standard. DCFS admits the denial of the section 388 petition was based on earlier errors; Christian was not advised of his right to file a writ petition when the section 366.26 hearing was set and therefore did not forfeit his right to challenge the termination of parental rights; and the conceded errors prevent reliance upon the dispositional orders as a proper finding of parental unfitness. DCFS thus states: "Here, appearing no basis for a finding of unfitness or detriment, DCFS concedes the juvenile court erred in terminating Father's parental rights." The agency concedes the appropriateness of reversing the juvenile court's findings and orders terminating Christian's parental rights, and a remand for a new hearing to determine the appropriateness of placing Esther with him.

12

compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation].' [Citation.]" (*Los Angeles County Dept. of Children & Family Services v. Superior Court of* (2013) 215 Cal.App.4th 962, 967.)

Under either manner of interpreting the standard of review, we conclude the juvenile court erred, as father argues and DCFS concedes.

"A man's status as biological father based on genetic testing does not entitle him to the rights or status of a presumed father." (*In re P.A.* (2011) 198 Cal.App.4th 974, 980 (*P.A.*).) And only presumed fathers are entitled to a full panoply of rights under the juvenile dependency laws, including reunification services under section 361.5, or custody under section 361.2. (*In re J.H.* (2011) 198 Cal.App.4th 635, 644 (*J.H.*).) "The Uniform Parentage Act ([Family Code] § 7600 et seq.) (the Act) establishes the framework by which California courts make paternity determinations. The Act 'provides for conclusive and rebuttable presumptions of paternity.' [Citation.] The rebuttable presumptions of paternity are set forth in [Family Code] section 7611 and, as relevant here, include a man who 'receives the child into his home and openly holds out the child as his natural child.' ([Fam. Code,] § 7611, subd. (d).)" (*P.A., supra,* 198 Cal.App.4th at pp. 980-981.)

Courts have interpreted the "receiving the child into his home" language to mean the man seeking to establish presumed father status must prove he has actually, physically brought the child into his home. He must also publicly admit paternity. (*In re Cheyenne B.* (2012) 203 Cal.App.4th 1361, 1379; *In re A.A.* (2003) 114 Cal.App.4th 771, 786-787; *In re Kyle F.* (2003) 112 Cal.App.4th 538, 542.)

In this case, before a petition was even filed, Christian identified himself as Esther's father and requested custody. He expressed concern for Esther's welfare, said mother moved Esther from Florida to California without his permission, and he, without any apparent reservation, wanted Esther to return to his home in Florida. In the JV-505

form, he declared he was present when Esther was born and he had kept her with him instead of placing her in daycare. He further indicated Esther lived with him until January 2012. He told his parents, his other children, and other relatives that he was Esther's father. He offered evidence indicating he was legally obligated to provide financial support for Esther. He had been legally declared Esther's father in a child support judgment. There was no evidence he disavowed paternity following that judgment. Instead, he stepped forward as soon as mother died. He also eventually procured a birth certificate naming him as Esther's father.

There was no evidence contradicting Christian's statements in the JV-505 form. In fact, at the hearing on his section 388 petition, no party challenged his request that he be deemed Esther's presumed father. DCFS and Esther argued against him having custody, but they did not dispute his evidence or his assertion that he should have presumed father status. Evidence in the record revealed that Esther's older sister identified Christian as Esther's father. Although Z.J. was several years older than Esther, she recalled having known Christian since *she* was a small child, and she remembered him coming to her family's house to visit Esther, although not for overnight visits. Mother's brother had negative things to say about him, but did not appear to deny his paternity. These statements supported Christian's assertion that he had in fact publicly acknowledged that Esther is his child.

Despite the lack of any challenge to Christian's evidence establishing he had brought Esther into his home and that he had publicly acknowledged his paternity, the trial court denied him presumed father status. The court identified four factors in its discussion of its ruling: (1) that Christian's JV-505 said Esther had lived with him from January 1, 2007 until January 1, 2012, which was impossible because she was born in 2008; (2) he was clearly not providing support for a time because the Florida court entered a support order; (3) his statements to social workers contained unspecified inconsistencies which damaged his credibility; and (4) the court discounted the birth certificate because it did not know if Florida law might allow a person to procure a birth

14

certificate identifying that person as a parent simply by filling out forms, rather than by being present at birth and signing certain documentation.

These uncertainties did not constitute substantial evidence to support a finding that Christian was not Esther's presumed father. The presumption under Family Code section 7611, subdivision (d), does not by its terms require that the parent provide financial support. Instead, the parent must establish only that he has brought the child into his home and has publicly acknowledged paternity. The child support order does not create an inference that Christian did not bring Esther into his home. (*In re J.O.* (2009) 178 Cal.App.4th 139, 151 (*J.O.*) [presumed father status not rebutted by failure to keep in contact with or support children].) Further, Christian supplied the child support order documents at the outset of the dependency proceedings, as a way of publicly declaring his paternity. Similarly, regardless of whether the birth certificate was an indication that he was present at Esther's birth, it again demonstrated his public acknowledgement of paternity, in a case in which no other man claimed to be Esther's father.[11]

" '[T]he direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact.' (Evid. Code, § 411.) Under this rule the trier of fact may not arbitrarily disregard the uncontradicted or unimpeached testimony of a witness, unless that testimony is inherently improbable." (*DeMiglio v. Mashore* (1992) 4 Cal.App.4th 1260, 1270.) Despite Christian's incorrect birth date for Esther, his evidence as a whole was not inherently improbable.[12] Although the court referred to unspecified

---

[11]     In ordering the termination of parental rights, the juvenile court noted it had two birth certificates for Esther, one dated September 2010, identifying Edward M. (Amanda's father) as the father, and one dated August 18, 2014, identifying Christian as the father. Esther was born in August 2008. The record does not contain a copy of the September 2010 birth certificate. There is no indication that Edward M. ever sought to be declared the presumed father of Esther (or Amanda), or that he had any paternity claim at all as to Esther.

[12]     DCFS concedes this point, indicating that although the juvenile court found some of Christian's statements in the JV-505 questionable, "the overwhelming evidence, which

15

"inconsistencies" in his statements in the DCFS reports, we have reviewed the record and have not found evidence to support this conclusion. Christian had been adjudged Esther's biological father, Esther's sister and uncle recognized him as Esther's father, and within two weeks after mother died Christian made himself known to DCFS, identified himself as Esther's father, and expressed his intent to take custody of Esther and take her back to Florida. He indicated Esther had lived with him, he had cared for her as a substitute for daycare, and he had acknowledged to others he was her father. All of these factors indicated presumed father status under Family Code section 7611, subdivision (d) was warranted.

Esther contends Christian showed no desire to be deemed her presumed father and did not come forward and ask to be recognized as such. The record does not support this argument. To the contrary, after mother died and before the petition was even filed, Christian came forward, identified himself as Esther's father, and requested custody, indicating he wanted Esther to return to Florida to live with him. No evidence in the record contradicts his statements that he could not attend the detention hearing because he did not have the money to travel to California. This was precisely coming forward and requesting to be deemed a presumed father. (See *In re Baby Boy V.* (2006) 140 Cal.App.4th 1108, 1116 [father did not waive right to request presumed father status where, upon learning of child, he went to DCFS office, presented himself to social worker, requested paternity test, and said he wanted to provide for and have a relationship with the child; a formal request was not necessary].)

Further, the Family Code section 7611, subdivision (d) presumption is not necessarily rebutted by the parent's failure to care for or provide financial support to his or her child. For example, in *In re J.O., supra,* 178 Cal.App.4th at pages 148-151, the children were living with their mother and a stepfather when dependency proceedings began. The appellant was living in Mexico. Once located, the appellant identified

_____

was never disputed by any party, demonstrated Father was Esther's legally presumed father."

16

himself as the father and said he was interested in getting custody of the children. The children had not had contact with him for years. However, the mother indicated the children had lived with the appellant until the parents separated and the appellant held himself out as the children's father. The children's birth certificates identified the appellant as the father. (*Id.* at pp. 144-145.) The juvenile court suggested the appellant's name could have been put on the birth certificates without his consent. (*Id.* at p. 146.) It also rejected as inadmissible evidence regarding support father said he had provided. (*Id.* at pp. 145-146.) Although the juvenile court found the appellant had held himself out as the children's father and publicly acknowledged his paternity, it determined presumed father status could " 'fall away.' " (*Id.* at p. 146.) The court therefore ruled the appellant was not the presumed father because he had not had contact with the children or provided financial support for several years. (*Id.* at p. 146.)

The Court of Appeal reversed the lower court finding, rejecting the proposition that the failure to care for or provide financial support to the children warranted a rebuttal of the presumption that the appellant was a presumed father under Family Code section 7611, subdivision (d). (*J.O., supra,* at pp. 149-150.) The court noted that while a biological father's failure to maintain a relationship with his children or to support them is relevant when resolving competing paternity claims, there were no such competing claims in the case before it. As a result, denying the appellant presumed father status would "effectively leave the children fatherless." (*Id.* at p. 150.)

The court further found applicable the California Supreme Court's admonition in a different context that "courts should not render children fatherless by too easily finding cause to rebut the . . . 7611(d) presumption . . . ." (*J.O., supra,* at p. 149.) The court explained the mother and children recognized the appellant as the children's father, his name was on their birth certificates, and he acknowledged the children at birth and supported them for several years. "Refusing to grant presumed father status to a man such as appellant, where no other parental figure is available to fill the gap, would serve only to punish the children by depriving them of a second parent. In addition, it would for all practical purposes deprive them of a connection with their father's family and the

17

opportunity of finding a home with one of the father's relatives, should the mother's attempt at reunification fall short." (*Id.* at p. 149, fn. omitted.)

Under the reasoning of *J.O.*, we reject Esther's arguments that it was proper to deny Christian presumed father status because of any failure to provide support resulting in the child support order against him, or his failure to participate in the dependency proceedings between May 2013 and March 2014. Christian's request for presumed father status was based on facts existing well before the dependency proceedings began. If those facts entitled him to presumed father status, that status did not "fall away" during the period he and DCFS were not in contact.

Moreover, this case is distinguishable from *In re Zacharia D.* (1993) 6 Cal.4th 435, in which the biological father learned of the child during the dependency proceedings but did not seek to intervene until after reunification services for mother had been terminated, at which point he asked for a paternity test; the court had appointed counsel for the father; and the father, now incarcerated, did not request visitation or reunification services. (*Id.* at pp. 440-442.) The court concluded he failed to achieve presumed father status and was therefore not entitled to reunification services. (*Id.* at p. 452.) Here, Christian unequivocally declared his paternity at the outset of the proceedings, requested custody, and presented evidence that at a much earlier period he had accepted Esther into his home and publicly held her out as his child. Substantial evidence did not support the trial court's finding that Christian was not Esther's presumed father.

## II.     The Juvenile Court Erred in Failing to Appoint Counsel for Christian

We agree with Christian and DCFS that the juvenile court's failure to appoint counsel for him deprived him of a meaningful opportunity to be heard under the circumstances of this case. "The United States Supreme Court has held that the liberty interest in 'the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.' (*Troxel v. Granville* (2000) 530 U.S. 57, 66). . . . The parents' right to raise their children 'is a compelling one, ranked among the most basic of civil rights.'

18

[Citation.] Thus, parents are entitled to a full complement of rights in dependency proceedings, including standing, appointment of counsel and reunification services." (*R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 371.) Accordingly, in California, the right of a parent to appointed counsel in dependency proceedings is both statutory and constitutional.

Under section 317, subdivision (b), when it appears to the court that a parent is unable to afford counsel and the child has been placed in out-of-home care, absent a knowing and intelligent waiver, the court must appoint counsel for the parent.[13] In addition to the statutory right, "[f]undamental fairness requires that counsel be appointed in some circumstances so that those appearing in a dependency hearing have a meaningful opportunity to be heard." (*R.H. v. Superior Court, supra*, 209 Cal.App.4th at p. 373, citing *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1153 (*Meranda P.*).) "To determine whether federal constitutional rights are implicated, we examine: (1) the private interests at stake; (2) the government's interest; and (3) the risk that the procedures used will lead to an erroneous decision. (*Lassiter v. Department of Social Services* [(1981) 452 U.S. 18, 31-33 (*Lassiter*)].) '[A]n indigent parent may in some cases have a due process right to counsel where the termination of parental rights may result.' [Citation.] This is because the parent's interest at the termination of parental rights stage is extremely important; the state shares with the parent an interest in a correct decision; and the risk of an erroneous deprivation of the parent's rights is insupportably high. [Citation.]" (*O.S., supra,* 102 Cal.App.4th at p. 1407.)

---

**13** Alleged fathers are not entitled to appointed counsel. (*In re J.O., supra,* 178 Cal.App.4th at p. 147 ["An alleged father is not entitled even to appointed counsel, except for the purpose of establishing presumed fatherhood."]; *In re O.S.* (2002) 102 Cal.App.4th 1402, 1406 (*O.S.*).) The juvenile court's failure to conduct a section 316.2 inquiry at the detention hearing, discussed below, and the failure to find Christian to be Esther's presumed father at the hearing, thus contributed to the accompanying failure to appoint counsel to represent him pursuant to section 317. (*In re B.C.* (2012) 205 Cal.App.4th 1306, 1311-1312; *In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120-1121.)

Perhaps even more than the usual case, here the risk of an erroneous deprivation of Christian's rights was extremely high. Christian lived out of state and did not have the financial means to travel to California. He could not simply show up at a hearing to attempt to vindicate his parental rights. At the same time, at the very outset of the proceedings, he made known his desire to have the care, custody, and control of Esther as her parent. When Christian declared himself to be Esther's father and expressed an intent to take custody, this was effectively a request that he be deemed her presumed father. Further, at the very beginning of the proceedings his whereabouts were known; he spoke with social workers only days before the initial detention hearing and told them where he lived. Appointed counsel was necessary to provide him with a meaningful opportunity to be heard, including to elevate his status to presumed father at the outset of the proceedings.

It is apparent that the presence of counsel in this case would have made a " 'determinative difference' " and the absence of counsel rendered the proceedings fundamentally unfair. (*In re Claudia S.* (2005) 131 Cal.App.4th 236, 251.) The petition's indication that Christian's whereabouts were unknown went unchallenged, even though that representation was not accurate when first made. At the detention hearing, there was no discussion of his communications with social workers up to that point, his status as a biological father, or his request for custody. The court did not conduct a parentage inquiry as required under section 316.2.[14] The procedures of that

---

[14]    Under section 316.2, subdivision (a), at the detention hearing "or soon thereafter as practicable, the court shall inquire of the mother and any other appropriate person as to the identity and address of all presumed or alleged fathers." The inquiry "shall include at least all of the following, as the court deems appropriate," a list of factors including whether a judgment of paternity already exists; whether the mother has received support payments or promises of support with respect to the child; whether any man has formally or informally acknowledged or declared his possible paternity of the child; whether paternity tests have been administered; and whether any man otherwise qualifies as a presumed father pursuant to Family Code section 7611. (§ 316.2, subd. (a)(1), (4), (5), (6), (7).) Under subdivision (b), if after the court's inquiry a man is identified as an alleged father, he is to be provided notice alleging he is or could be the child's father,

section are intended to "provide an alleged father with the notice to which he is entitled and the means by which to 'assert a position and attempt to change his paternity status.' [Citation.]" (*In re Paul H.* (2003) 111 Cal.App.4th 753, 761.) The failure to conduct this inquiry meant that Christian's request to elevate his status went unrecognized, and no JV-505 notice was sent to him at that time pursuant to section 316.2, subdivision (b). Without counsel, he had no ability to ensure these procedures were followed. (*O.S., supra,* 102 Cal.App.4th at pp. 1410-1412 [prejudicial ineffective assistance of counsel when attorney failed to timely establish elevated paternal status].)

As the proceedings continued, social workers tried calling Christian only twice, then sent him notices that were returned, unclaimed and unopened. Although it was clear he was not receiving the notices being sent to him, DCFS displayed a near total lack of effort to adequately notice him. (*In re Arlyne A.* (2000) 85 Cal.App.4th 591, 598-599 [adjudication order based on unknown whereabouts of parent was invalid for lack of due diligence where agency failed to explore the most likely means of finding the parent]; *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418-1419.) In addition, there is no indication in the record that DCFS alerted the court to the fact that notices to Christian were being returned to the office, unclaimed. The jurisdiction report described him as not requesting family reunification services and not requesting custody. This was highly misleading, at best. He had requested custody before the petition was even filed. As a noncustodial presumed father, Christian was entitled to consideration for placement under section 361.2. At a minimum, because he was a biological father, the court had the discretion to order reunification services for him. (§ 361.5, subd. (a); *J.H., supra,* 198 Cal.App.4th at p. 644.) Without adequate notice of the proceedings and no counsel to represent him, Christian was denied reunification services, inevitably leading to the termination of parental rights. (*Katheryn S. v. Superior Court* (2000) 82 Cal.App.4th

---

informing him of the proceedings, and including the judicial council form Paternity-Waiver of Rights (JV-505).

958, 972-973 [had indigent parent been represented by counsel, seemed "manifest" that ill-advised orders that had no evidentiary support would have been challenged in juvenile and appellate court; fundamental unfairness that violated minimum due process requirements].)

On appeal, Esther asserts the lack of appointed counsel did not create any fundamental unfairness because Christian had the opportunity to ask the social workers about appointed counsel but intentionally chose not to, and he demonstrated no interest in being heard. (*In re Ebony W.* (1996) 47 Cal.App.4th 1643, 1648 [record established agency served mother or made efforts to locate her for service; mother never appeared and never manifested any interest in having appointed counsel].) We cannot agree. Although Christian was informed of the detention hearing by telephone at most six days before the schedule hearing, there is no record that a social worker informed him counsel could be appointed for him. The record contains no proof of mailing any notice or documentation to Christian.[15] (§ 290.2 [requirements for written notice of the initial hearing]; *In re Claudia S., supra,* 131 Cal.App.4th at pp. 247-248.) Subsequent notices were returned unclaimed. The record offers no reason to believe Christian knew or had any reason to know he had a right to appointed counsel, or that additional hearings were

---

[15]     According to the DCFS reports, the social worker told Christian on April 30 that the detention hearing would be held on May 6, which, it appears, was not the detention hearing for Esther, but was instead for her two siblings. A social worker subsequently called him on May 7 to inform him of the detention hearing for Esther on May 9, two days later. Under section 290.2, "Upon the filing of a petition by a probation officer or social worker, the clerk of the juvenile court shall issue notice, to which shall be attached a copy of the petition . . . ." (§ 290.2.) When a child is "retained in custody," notice is to be given "as soon as possible, and at least five days before the hearing, unless the hearing is set to be heard in less than five days in which case notice shall be given at least 24 hours prior to the hearing." (§ 290.2, subd. (c)(1).) If the child is not retained in custody, notice is to be given at least 10 days before the hearing date. If a person entitled to notice lives outside the county, notice is to be sent by first-class mail "as soon as possible after the filing the petition and at least 10 days before the time set for hearing." (§ 290.2, subd. (c)(2).)

22

being conducted, until August 2013, when the notice of the jurisdiction hearing was untimely sent.**16**

Moreover, we cannot infer from the record that Christian displayed a lack of interest in being a father to Esther. He came forward at the very beginning of the proceedings. He appeared to incorrectly assume that, as a non-offending parent, having Esther returned to him would be automatic. Then, for months, he received no information about the matter, as notices sent to him were undeliverable. Eventually he called the social worker *and* the court. By mid-August 2014, he had procured a birth certificate for Esther, identifying him as her father. He told the social worker that he had gotten "the run around" when he had previously tried contacting the social worker.

Ideally, Christian would have done more to intervene in the dependency proceedings after the detention hearing, in spite of financial barriers, physical distance, probable lack of familiarity with the California dependency system, and lack of actual notice of the proceedings following the detention hearing. Yet, we cannot ignore that had the court appointed counsel for him at the outset of the proceedings, one effect would have been to mitigate these problems. Christian's statements to DCFS in fact suggested he had tried to contact a social worker, unsuccessfully, and that he had attempted to discern on his own how to proceed. This was exactly the role an attorney could have played for him, had one been appointed to represent him. This case is distinguishable from *Lassiter*, in which the mother was adequately served with notice of the hearing to terminate her parental rights, she attended the hearing in person, she had retained counsel in a contemporaneous criminal matter but did not mention the termination hearing to him, she had expressly declined to appear at a previous child custody hearing, and counsel "could not have made a determinative difference." (*Lassiter*, *supra*, 452 U.S. at pp. 21, 33.) In contrast, it is not clear here that Christian's absence from the proceedings was similarly willful, or that his lack of participation was an indication of "noninterest"

---

**16**    The record does not indicate this notice was returned to DCFS. However, under section 291, subdivision (c)(1), Christian was entitled to notice at least five days before the hearing. As DCFS concedes, notice was mailed only four days before the hearing.

23

in Esther. Indeed, his voluntary discussions with DCFS at the outset of the case, and his actions upon his reappearance—calling the social worker, calling the court, procuring a copy of Esther's birth certificate—all suggested otherwise.

Christian's actions also distinguish this case from *In re Marcos G.* (2010) 182 Cal.App.4th 369 (*Marcos G.*), upon which Esther relies. In *Marcos G.*, the father was incarcerated when his biological son was born and when the dependency proceedings began. The father was determined to be alleged only; the court did not appoint counsel to represent him. (*Id.* at p. 375.) Father eventually appeared, asserted notice to him had not been proper, and requested in a 388 petition that the court hold a new disposition for him and find him to be the child's presumed father. (*Id.* at p. 380.) The juvenile court denied the petition and also terminated the father's parental rights. (*Id.* at pp. 381-382.) The Court of Appeal affirmed the juvenile court orders. Despite errors in notice, and the juvenile court's failure to conduct an initial parentage inquiry, the reviewing court found the errors not prejudicial. For 16 months the father made no attempt to come into court and address parentage issues. There was evidence the father had actual notice of the proceedings, including because his relatives attended hearings. Ultimately, the court concluded the father had ignored the case and, even had father received required notices and been transported to the jurisdiction hearing, the result would not have been different. The father was incarcerated and his family members could not care for the child.

In contrast, here the errors that occurred made a difference. Christian was not incarcerated and was able to have Esther in his care. He was simply out of state and without the means to travel to California. His lack of appointed counsel prevented him from elevating his status to presumed father at the beginning of the case and thereby receiving the accompanying benefits. The lack of appointed counsel further compounded the errors in notice.[17] Unlike *Marcos G.*, there is an inference that Christian did *not* have

---

[17] We note that even when a (presumed) parent's whereabouts are unknown, that parent may have rights upon reappearing after the jurisdiction and disposition hearing. For example, "[i]f the whereabouts of the parent becomes known prior to the six-month review hearing and the parent requests services, the Department has a duty to seek a

actual notice of the proceedings, his right to counsel, or his right to a parentage determination because the notices sent to him were returned to DCFS as undeliverable. There was no indication in the record that he knew the caregivers or that they were in touch with him at all; they had only met mother shortly before she died. While jurisdiction may have been proper because mother's death left Esther at least temporarily without support, Christian, through counsel, could have challenged the allegation that his whereabouts were unknown. Certainly he would have been entitled to either consideration for placement under section 361.2, or reunification services. (*In re Suhey G.* (2013) 221 Cal.App.4th 732, 744-745 [failure to properly serve father deprived him of opportunity to appear at disposition hearing and obtain custody under section 361.2].) The court could not have denied reunification services based on Christian's whereabouts being unknown without an affidavit or proof establishing a reasonably diligent search had failed to locate him. (§ 361.5, subd. (b)(1).) Appointed counsel was necessary for him to meaningfully participate in the proceedings. It is apparent that his lack of counsel had a determinative effect on the outcome.

## III. Forfeiture

We further conclude Christian is not barred from challenging the orders preceding the termination of parental rights by his failure to do so earlier, or by failing to explicitly raise due process violations in the juvenile court. *In re S.D.* (2002) 99 Cal.App.4th 1068 (*S.D.*), is instructive on this point. In *S.D.*, the mother appealed from an order terminating her parental rights, but she asserted a claim for ineffective assistance of counsel at the jurisdiction hearing. The appellate court rejected the argument that the claim was waived as a matter of law. The record demonstrated counsel's error— essentially conceding jurisdiction—was legal, fundamental, and determinative, such that subsequent procedural safeguards were inapplicable. (*Id.* at p. 1080.) Depriving the

---

modification of the dispositional order. (Cal. Rules of Court, rule 5.695(h)(9) ['If the parent or guardian is located prior to the 6-month review and requests reunification services, the welfare department must seek a modification of the disposition orders.'].)" (*In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1258.)

25

mother of the right to correct counsel's error on appeal was inconsistent with fundamental fairness.

Similarly, in *In re M.F.* (2008) 161 Cal.App.4th 673 (*M.F.*), the mother appealed from a juvenile court's order terminating parental rights, but challenged the juvenile court's failure to appoint her a guardian ad litem until after her reunification services were terminated. (*Id.* at p. 676.) Although mother failed to file a writ following the denial of her reunification services, the court declined to apply the waiver rule. The court explained "[r]elaxation of the waiver rule is appropriate when an error 'fundamentally undermine[s] the statutory scheme so that the parent would have been kept from availing himself or herself of the protections afforded by the scheme as a whole.' [Citation.]" (*Id.* at p. 682.) Because the failure to appoint a guardian ad litem affected the mother's very ability to meaningfully participate in the case, the court found it inappropriate to apply the waiver rule. (*Ibid.*; *In re T.G.* (2013) 215 Cal.App.4th 1, 13-14 [declining to find waiver of argument that parental rights could not be terminated because no finding of parental unfitness had been made].)

*Meranda P.* also provides a helpful contrast. In *Meranda P.*, the mother also challenged an order terminating her parental rights. She claimed the order was the product of multiple errors at the detention, jurisdiction, disposition, and review hearings that preceded it. The mother also argued, in part, that she was improperly denied counsel or denied effective assistance of counsel. The court declined to create an exception to the rule that an appellate court in a dependency proceeding may not review the merits of a prior final appealable order from a later appealable order, even though the issues raised involved the constitutional and statutory right to counsel. (*Meranda P.*, *supra*, 56 Cal.App.4th at p. 1151.) To come to this conclusion, the court determined enforcing this waiver rule did not infringe the mother's due process rights. It reasoned the state's interest in expediting the process and finality is strong, as is the child's interest in securing stability and permanency; both of which are undermined by allowing a parent to raise issues concerning the validity of a final appealable order. (*Id.* at p. 1152.)

In addition, the *Meranda P.* court explained the risk of an erroneous deprivation of parental rights is diminished by the requirement that the parent show harm or fundamental unfairness as a result of the lack of counsel or effective counsel, and the significant safeguards and checks and balances that work to preserve the parent-child relationship and reduce erroneous fact-finding, even in the absence of counsel. (*Meranda P., supra,* at pp. 1153-1154.) In *Meranda P.*, the mother said she did not want a lawyer, "squandered four opportunities to complain" on appeal about her representation, and at the outset of the proceedings the juvenile court informed her of her right to counsel and right to appeal. (*Id.* at p. 1158.)

In this case, the record does not establish Christian was informed of his right to counsel. He was not represented by counsel until shortly before the hearing to select and implement a permanent plan and terminate his parental rights. The juvenile court failed to appoint counsel at the outset, despite Christian's evidence of, at a minimum, biological paternity, and what could only be understood as his request to elevate his status to presumed father. His financial status and out of state residency made him uniquely unable to participate in the case without representation. Accordingly, none of the rights he should have had as a presumed father were accorded to him. DCFS then failed to provide adequate notice of the proceedings. Although notice to Christian was returned unopened, DCFS did not exert any effort in attempting to locate him until seven months *after* the jurisdiction and disposition hearing. We cannot say that the procedural safeguards set forth in the statute worked in this case to protect his rights, even in the absence of representation. Further, the failures infected the entirety of the proceedings, prejudicing Christian, most notably at disposition. As in *M.F.*, the error here " 'fundamentally undermine[d] the statutory scheme so that the parent would have been kept from availing himself or herself of the protections afforded by the scheme as a whole.' [Citation.]" (*M.F., supra,* 161 Cal.App.4th at p. 682.)

27

## IV.    Conclusion

In light of the fundamental errors in this case, as in *M.F.* and *S.D.*, we find it necessary to remand to allow the court to conduct a new disposition hearing to consider placement under section 361.2 subdivision (a) and/or reunification services.[18]  As a noncustodial parent—offending or nonoffending—Christian was entitled to have the court determine Esther's placement under section 361.2.  (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1503-1505; see *In re Suhey G., supra,* 221 Cal.App.4th at pp. 743-744 [failure to make adequate efforts to locate father and provide him timely notice of proceedings warranted new hearing under section 361.2].)  Even if the court did not place Esther with Christian based on a finding it was detrimental to do so, he was entitled to reunification services, absent a basis to bypass services under section 361.5.  (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 55-59.)

We understand Esther's arguments on appeal that separating her from her siblings and caregivers would not be in her best interest, and the importance of not delaying permanence for her.  We express no opinion on these issues which the trial court will need to address on remand.  Instead, we conclude only that a new disposition hearing must be held, at which the trial court will consider all relevant circumstances.

---

[18]    Christian argues there was no substantial evidence to support the jurisdictional allegations as to him because his whereabouts were known and he had the ability to provide support for Esther.  Yet mother's untimely death did in fact leave Esther without any provision for support and he was unable to immediately provide that support.  Even if these facts do not indicate any parental unfitness on his part, they do support the conclusion that jurisdiction was necessary at that time, and, despite errors in notice and lack of counsel, the proceedings at jurisdiction did not reflect a miscarriage of justice.  Indeed, although Christian argues the court's jurisdictional findings were unsupported by the evidence, his request for relief is *only* that this court remand for a new hearing on placement and services.  Thus, we do not disturb the jurisdictional order.

## DISPOSITION

The orders terminating parental rights and denying Christian's section 388 petition are vacated.  The matter is remanded to the juvenile court with directions to enter an order declaring Christian the presumed father of Esther, and to conduct a new disposition hearing consistent with this opinion.


                                        BIGELOW, P.J.

We concur:


        RUBIN, J.


        FLIER, J.

29